# Commonwealth *v.* Hazlett.

*Banks and banking—Receiving deposit when bank is insolvent—Criminal law—Act of May 9, 1889, P. L. 145.*

The purpose of the Act of May 9, 1889, P. L. 145, was to protect all depositors, or intended depositors, from imposition by bankers who, knowing the bank to be insolvent, continued to receive deposits.

The Act of May 9, 1889, P. L. 145, was not merely aimed at the carrying on of business by an insolvent bank, but it dealt with specific acts and measured the punishment, in part, by the amount of money obtained by the offender as the result of each specific violation. A banker who under the forbidden conditions, receives deposits from two or more different persons, upon the same day, is guilty of two or more separate and distinct offenses. An indictment charging such unlawful receipt of money from A. would not be supported by proof of such a receipt of money from B. Neither a conviction nor an acquittal, upon such an indictment, charging a deposit to have been made by one person, is a bar to a subsequent prosecution charging a distinct deposit made by another person.

*Practice, Q. S.—Pleading—Plea in bar—Demurrer.*

On demurrer to a plea in bar the court will consider the whole record, and give judgment for the party who, on the whole, appears to be entitled thereto. If the plea is former acquittal, the question whether the former acquittal was for the same offense depends upon the record pleaded, and not on the arguments or inferences deduced therefrom.

*Banks and banking— Receiving deposits when insolvent— Pleading— Former acquittal—Act of May 9, 1889, P. L. 145.*

Where on an indictment for receiving money when a bank was insolvent, the defendant files a plea of former acquittal, averments in the plea that in the former case the defendant admitted receiving the money from the prosecutor therein named, and that the only issue was whether he received it when the bank was insolvent, knowing it to be insolvent, are insufficient to overcome the record showing a plea of not guilty and the general issue.

*Practice, Q. S.—Trial—Talking in presence of jurymen—Continuance.*

In the absence of any evidence of an abuse of discretion, the appellate court will not reverse the action of the trial judge in refusing a motion of the defendant at a criminal trial to dismiss the jury and continue the cause on account of occurrences which resulted from an alleged talking about the case in the presence of a juror.

*Practice, Q. S.—Continuance—Absence of witness—Discretion of court.*

The appellate court will not review the discretion of the trial court, in the absence of evidence of the abuse of discretion, in refusing to continue a cause upon the ground of the absence of a witness.

*Practice, Q. S.—Charge of court—Erroneous statement as to evidence.*

Where at the trial of a criminal cause the judge makes a mistake in stating the evidence, and the attention of the court is called to the matter, and the mistake is corrected and defendant is not thereby injured, a judgment against the defendant will not be reversed.

*Banks and banking—Insolvency—Evidence.*

The facts that a banker closed his bank, refused to pay his depositors' money due and payable when demanded, and made an assignment for the benefit of his creditors after preferring some of them, are sufficient, if found by a jury, to establish the banker's insolvency.

*Banks and banking—Receiving deposit when insolvent—Evidence as to value of defendant's property.*

On the trial of an indictment against a banker for receiving deposits when insolvent, where, on the question of insolvency, various witnesses for the defendant have testified as to the value of defendant's property, and two witnesses for the defendant based their estimate upon what they would have paid for it in depreciated certificates of the bank, it is error for the court to charge that if the jury believed the testimony of the two witnesses, then under all the evidence including the defendant's testimony, the estimates of value were not found upon a proper basis. Such an instruction vitiated the testimony of the defendant, and all the other witnesses of the defendant.

Where a witness in testifying as to the value of a farm, states that he is acquainted with the market value of farm land in the community, and testifies without objection that the land was worth a certain price per acre, it is reversible error for the court to tell the jury that the witness did not " fix his estimate from the basis of a market value."

On the trial of an indictment against a banker for receiving deposits when insolvent, it is proper to permit a witness who had been one of the appraisers of the banker's assigned estate, when confronted with the appraisement which he had made, to make an explanation as to the manner in which the appraisers had arrived at the values of the property appraised.

On the trial of an indictment against a banker for receiving deposits when insolvent, where one of the questions raised was the value of certain stock of a corporation owned by the banker at the time of his failure, it is reversible error to permit a witness to give an opinion as to the value of the stock founded upon the opinion of another person not called, without any attempt whatever to show that either the witness or his informant had any knowledge which rendered either of them competent to testify as to their opinion of the value of the stock.

On the trial of indictment against a banker for receiving deposits when insolvent, a witness may be permitted to testify as to the facts relating to the value of defendant's property which he himself had communicated to the defendant prior to the alleged commission of the offense charged.

*Evidence—Expert witness—Opinion—Cross-examination.*

When a witness has been permitted to testify as an expert as to the value

of real estate, a reasonable latitude is allowed for cross-examination in order that the jury may·be fully informed as to the facts upon which the opinion of the expert is based, and the processes of reasoning by which he arrived at the conclusion given.

Argued Dec. 3, 1900. Appeal, No. 66, April T., 1901, by defendant, from judgment of Q. S. Washington Co., Feb. T., 1899, No. 84, on verdict of guilty in case of Commonwealth v. Samuel Hazlett. Before RICE, P. J., BEAVER, ORLADY, W. W. PORTER and W. D. PORTER, JJ. Reversed.

Indictment against a banker for receiving deposits when insolvent. Before TAYLOR, J.

The case was previously reported in 14 Pa. Superior Ct. 353.

The defendant pleaded former acquittal. The special plea after reciting the indictment, averred as follows:

And the said Samuel Hazlett avers that he and the Samuel Hazlett, who was the defendant in the indictment recited in this plea and acquitted as aforesaid, are one and the same person, and not divers and different persons; and that the offense in said last mentioned indictment set out and the one charged in the indictment to which this plea is pleaded are one and the same offense, and not divers and different offenses, this defendant avers is true, because he, the defendant avers, states and charges, that on said first mentioned indictment, his trial covered the statutory period of two years preceding the time of finding the said indictment, and the dates in said indictment were held immaterial. That is to say, defendant avers that he was found not guilty of receiving the deposits in said indictment mentioned, notwithstanding the deposits were proved to have been made on other different days than that mentioned in the indictment, to wit, March 12, 1898, provided they were made within two years from the finding of said indictment. And the defendant further avers that on the said trial, he, the defendant, admitted that he was a banker for more than two years prior to the finding of said indictment, and that all of the deposits charged in said indictment to have been received by him, were received by him as bank deposits, and that he, the defendant, on the said trial denied only that within the two years prior to the finding of the said indictment, he or the said bank was at any time insolvent, and also denied that at any time within the two years

prior to the finding of the said indictment, he had knowledge of his insolvency, or of the insolvency of the said bank. Wherefore, the defendant says he was once before acquitted of this same alleged offense.

The commonwealth demurred to the plea. The court sustained the demurrer. [1, 2]

The defendant moved to dismiss the jury and continue the case. The record of this motion and ruling of the court, with the exception thereto, is as follows:

Be it remembered that during the trial of the above styled cause, the public news journals of this date having published that one Wm. M. Gray had been guilty of talking in the presence of jurors or a juror in said cause at a hotel commonly called The Hotel Swingle, and that said talking by said Wm. M. Gray had been with the intent and purpose of unlawfully influencing the said juror or jurors in said cause; and the said journals having in addition stated that said Wm. M. Gray had been arrested and his case be investigated on Saturday · and the prosecuting attorney having repeated said statement in substance in open court before the jury, the defendant in person and by counsel moved the court to continue the cause, which motion the court overruled.

The Court: The court having, before the close of the testimony of the commonwealth's case in chief, and before any testimony was introduced before the jury on behalf of the defendant, seen in the " Washington Observer " published during the adjournment of the court over night, an article to the effect that at a certain hotel at the supper table where one of the jurors boarded, some reference was made by a stranger in the town by the name of Wm. M. Gray, to the case on trial in presence of one of the jurors sitting on said case, the court asked the district attorney to bring the matter before the court by a reference to the same that the court might further caution the jury generally against all outside influences, and in particular instruct any juror or jurors at said hotel to utterly disregard and lay aside anything that may have been said at said hotel aforesaid, if anything was said, about the case in his presence; this caution and instruction was given the jury, for which purpose alone the matter was referred to in open court—no reference being made as to whether the said Wm. M. Gray had re-

marked, if he had, concerning the case favorable to the side of the commonwealth or the defendant. We further asked district attorney to investigate the matter and take such further steps as the facts of the case warranted under his official oath and in the interest of public justice.

Exception and bill sealed. [3]

The court also refused to continue the case on account of the absence of a witness. [5]

R. S. Winters, a witness called by the commonwealth, was asked this question:

" Q. Now, sir, you have mentioned a number of things in there which you say you marked as doubtful and regarded as of little practical value or possible value, as I understand it; will you now state to the jury what proportion of the scheduled assets there, was in your opinion, of any practical value or probable value as assets in the hands of his assignees ? "

Purpose asked for.

The witness having been asked on cross-examination if he had not made that return under oath and if it did not represent then his judgment of the value of assets there scheduled, I desire to ask him now what, if any, of the scheduled assets were, at the time of that report having been made, of any practical or available value as assets in the hands of the assignees of the defendant, that are included in this report.

Objected to as incompetent and irrelevant; besides, we asked him nothing except whether the report was a truthful one, as he understood it then.

The Court: Objection overruled; offer admitted and on request of defendant exception allowed and sealed. [12]

Boyd Crumrine, Esq., was asked this question:

" Q. State whether or not you were attorney for the assignees of the estate of Samuel Hazlett. A. One of them. Q. I want to ask you concerning certain scheduled assets, as to your knowledge of values; 125 shares of Head Quarters Mining stock, appraised at $2,500; have you any knowledge of that, whether that had any value? A. Well, I had no knowledge as to whether they had any value at the time of the assignment or not; I know that it was one of the items as to which I made an investigation since the assignment and endeavored to ascertain— Q. When did you make your investigation? A. Well,

I can't give you the date; it is too much to do, to remember in my own head, very well, without the papers, what it was; I am not able to say whether it was before the last account was settled, or not, with certainty, but I inquired of a gentleman whose name appeared on the certificates as the secretary of the company; I found his name was there on the stock, and I went to him to find out about the condition of the company; his name was Elliot Rogers, I think; I am not sure.

Objected to as incompetent.

" Q. I want to know whether you made an investigation; and now can you state whether or not they had any—that is any practical value, as assets of this estate?   A. From the information—he is the only person of whom I made any inquiry I believe."

Objected to as incompetent; that is not the way to prove values.

The Court: As a result of his investigation did he learn; did he make his investigation as attorney for the assignees?

Witness: "Yes, sir, I did.   Q. Do you mean you were one of the attorneys or the attorney?   A. Myself and my son have been, I believe, the only counsel of the assignees, and I had charge of this matter, because Mr. Rogers's office—when I found his name to the certificate, as secretary of the company, I went to him, and I obtained certain information.

The Court: I think he is entitled to give the result of his investigations, and give what they were, and the jury can take them for what they are worth, as the best evidence obtainable by him; it might not be the best course to pursue.

Cross-examination (Colonel Arnett):

" Q. Where does Rogers live?   A. He is a very prominent attorney at Pittsburg, and is city solicitor of Allegheny City; his office is in, you might say, the same building as my own; it is in another part of it.   Q. It isn't a listed stock, I believe? A. Oh, no, I think not, from what I am told."

Defendant's counsel: We wish to renew the objection.

The Court: As attorney for the assignees, he can state that he made an investigation as to the value of this mining stock, and whether it had any value or not, from the information he received, acting in that capacity, and that he so reported to

his clients; I think that is proper. Objection overruled and on request of defendant, exception allowed and sealed. [13]

J. M. Dickson, Esq., a witness called by the commonwealth, was asked these questions:

"Q. In the inventory it is scheduled that the defendant had twenty-five building lots in Rapid City, is that true or not? A. No, sir, there were fourteen; the block of lots owned by the company contained fourteen lots, and the block of lots owned by Mr. Hazlett contained fourteen lots. Q. Instead of twenty-five? A. Yes, sir. Q. And it is also stated here a one-third interest in twenty-five building lots? A. Well, that is a mistake, it is a one-fifth interest in fourteen building lots, Mr. Hazlett had a one-fifth interest. Q. He owns fourteen outright and the one-fifth interest in fourteen additional, is that correct? A. Yes, sir, that is correct. Q. Mr. Dickson, were you acquainted with the market value of those lots on the 12th of March, or in March, 1898? A. Well, only by information which I had received through our agent in Rapid City. Q. State whether or not—state who had charge of the business here of the company. A. Why, I had charge of it, when the taxes were due, I would get it from the others; I would obtain their proportion of it and send it on to the party at Rapid City, and they would pay the tax and send the receipts, and at that time we would have communications with regard to the property and its value, etc. Q. You had charge of the business here? A. Yes, sir, I had. Q. State whether or not you communicated the information you had to the defendant. A. Yes, sir, yes, sir, I communicated to all the members, all the owners, Mr. Hazlett among the rest. Q. State what communication you communicated to the defendant in particular prior to that time in regard to the value of those lots."

Objected to as incompetent.

The Court: If he communicated the result of his information to the defendant, and he acted on that line, then I think it is correct. Objection overruled and on request of defendant exception allowed and sealed.

"A. Yes, sir, I gave him all the information I had in connection with the lots; we had been endeavoring to dispose of them, and the information which I received was they were not marketable. Q. That information you communicated to the

defendant? A. I received and communicated to him, yes, sir.
Q. What was it? A. That they weren't marketable at all."

Objected to as incompetent.

The Court: You say you communicated it to the defendant?

" A. Yes, sir."

Objected to as incompetent.

The Court: Objection overruled and on request of defendant exception allowed and sealed. [14]

John Overholt, a witness called by the defendant, was asked these questions:

Cross-examination (Mr. Parker):

" Q. Mr. Overholt, that sale by the assignees, was it June of 1898, did I understand you? A. Of 1899. Q. June of 1899? A. Yes, sir. Q. That would be a year and three months after March of 1898? A. I believe so. Q. You lived on that farm from 1890 up to the time of sale? A. To the present time. Q. The coal in that immediate neighborhood came into the market and became available and marketable subsequent to March of 1898? "

Objected to as incompetent.

The Court: I think that it is competent; they can ask him all about that and can test his knowledge of value and fix it in that way.

Offer asked for.

The witness having testified to his knowledge of the values of land in the neighborhood of this land and of his knowledge of this land from 1890, and having testified on behalf of the defendant as to its value as indicated by sales, and his opinion of the value of the remaining part of the asset in June of 1899, the commonwealth desires, upon cross-examination, to ascertain whether or not that value—the value of the land—had increased by virtue of a coal boom and coal developments subsequent to March, 1898; to be followed by an inquiry of the witness who has testified to his knowledge as to its market value in March, 1898.

Objected to for the reason that the witness was only asked on direct examination as to what the value of the coal and surface was at and immediately after the time it was sold by the assignees; it was not asked on direct examination as to what its value had been prior to that time, and it is not proper to

cross-examine him as to any matter about which he was not examined in chief. The testimony is objected to generally as incompetent, irrelevant and immaterial.

I desire to add to my offer this purpose, this inquiry, for the purpose of enabling the jury to determine the value of the witness's testimony as bearing upon the true issue in this case, to wit: the true market value of this land in March, 1898, at the time when the money was received, which is charged in the indictment in this case.

Objection renewed, with the addition that the presence or absence of a coal boom would not affect the market value of the surface of the land.

The Court: Objection overruled and offer admitted, and on request of defendant exception allowed and sealed. [15]

The court charged in part as follows:

[These assignees soon thereafter petitioned the court for the appointment of three appraisers, who, under oath, appraised the assets turned over and given in by the assignor, at values, in many instances, placed thereon by the defendant; and one of the appraisers testifies they made a liberal appraisement for the assignor. They made up a statement of the amount from this and the books of the bank and records, which shows liabilities of the defendant March 12, 1898, the date of the deposit in this case, after eliminating many worthless notes and accounts, as testified to be uncollectible by one of the assignees, which statement and appraisement showed the defendant's liabilities to be many thousands of dollars in excess of his assets at the date of the closing of the bank.] [6]

[Mr. Parker: I want to call the attention of the court to a matter. I understand the court, in the beginning of its charge, to mention the fact of a statement having been made of the liabilities of the defendant; I think the word "liabilities" probably was used where another word was intended. I don't remember that there was a statement of liabilities except the defendant's published statement.

The Court: One of the appraisers testified there was a statement furnished to them of the assets, and that statement showed what the assets were and also showed the liabilities.

Mr. Parker: I think your honor is mistaken about that, and that is the reason I call attention to it.

The Court: There may be some confusion about it in view of the other trial.   It appears, gentlemen of the jury, that there was no statement of liabilities furnished the appraisers by the defendant, but a statement of his assets.   The showing of the defendant's liabilities was embraced in his published statement, so far as the evidence in this trial is concerned.] [7]

[If there were no other testimony in the case except that which establishes the fact that the defendant closed his bank, refused to pay his depositors money due and payable when demanded, and made an assignment for the benefit of his creditors after preferring some of them, and these facts were established beyond a reasonable doubt in your mind, they would, in law, be sufficient to justify you in coming to the conclusion that the defendant was then insolvent; for all these facts clearly negative the idea that he was able to pay or provide for the payment of his debts within a reasonable time through the agency of his bank, or through his own agency.] [8]

[The commonwealth further claims that this published statement of the defendant which he sent to the printing office at night, which statement gave a summary of his assets and liabilities showing considerable of a balance of assets over liabilities, and that he was retiring from the banking business on account of ill-health, when taken in connection with other testimony introduced by them as to the great disparity between the market values of the defendant's real estate, the worthlessness of many of his notes on different persons, which his assignees have been unable to collect, and which he listed as good paper for the amounts specified therein, and the excessive values placed on his various stocks and bonds over and above their market value at the time, should satisfy you beyond a reasonable doubt that the values the defendant therein placed upon his assets were not only not the fair market values of his property, nor bona fide made, but inflated for the express purpose of deceiving his creditors and making his property appear in value greater than his liabilities; and in this the commonwealth claims further, that there can be no mistake, as the defendant testified he had dealt largely in real estate since he embarked in the banking business, and had become the owner

of many farms and pieces of town property, held for many years, he well knew the values then placed thereon, and now, were largely in excess of their several fair market values, especially, they say, when they have called many witnesses, real estate men by occupation, familiar with the town properties in this county, and farmers and real estate men familiar with not only the properties, town and county, but showing also a knowledge of the fair market values of the defendant's real estate where located at the time of the closing of the bank, and at the time he received the prosecutor's money as a deposit, and, that against all this, in behalf of the defendant, on the question of market values of properties owned by him at the closing of his bank, there is but the testimony of himself and his son, who placed the same values thereon in almost every instance as his father, except some others whom, the commonwealth claims, testified to values from motives of friendship for and favors received from the defendant, and others who gave their own personal opinion of values of certain pieces of the defendant's real estate, and not fair market values, and also the testimony of Messrs. White and Little who proposed to purchase the "Linn" and "Taylor" properties and the "Hamilton" farm at the defendant's own price, paying for the same with the certificates of deposit these purchasers held on the defendant in large amounts, and had collected from some others, at their face value, and the balance in cash or deposit balances, when these certificates of deposit on this closed bank were then, some selling and others offered for sale, at from fifty cents to seventy-five cents on the dollar; and if this is found by you to be the case, then under all the evidence, including the defendant's testimony as well, their estimates of values are not founded on the proper basis and the values of these three pieces of property would not be greater, in fact, than the value placed thereon by the commonwealth; and all this affects the values placed on the whole of the defendant's property by himself and son, and all other of his witnesses testifying to values not based on fair market values; and that you should have no trouble in coming to the conclusion that the defendant was insolvent on March 12, 1898.] [9]

[Mr. Bane: I understand your honor to say, in the course of the charge, that it was claimed by the commonwealth that

those witnesses who testified as to value were friends of the defendant and probably or possibly interested in the case.

The Court: That is the claim of the commonwealth as to some of them; they are all not to be so considered, gentlemen of the jury.

Mr. Bane: I believe your honor named some of them. We wish to call the attention of the court to the fact that there was no evidence that any of these witnesses were related to the defendant in any way; there was no evidence, as we claim, that they were particular friends of the defendant; some of them were his heaviest depositors, and men who might have been prejudiced against him, and men like Mr. McClane—

The Court: Our recollection is that some of the defendant's witnesses, when testifying to values they placed on certain pieces of the defendant's real estate, on cross-examination admitted they were friends of the defendant; another, perhaps, that he was a depositor when the bank closed, but the defendant paid him in full. Mr. Little and Mr. White were heavy depositors and got no preference, except as they were to take valuable pieces of the defendant's real estate at his own price under an arrangement with him to pay his price in certificates of deposit and deposit balances, which certificates of deposit they then held were worth, as the commonwealth claims they have shown, were then worth but fifty cents on the dollar. The testimony of Mr. M. W. McClane, to which the defendant calls our attention, was as to the value of the Hamilton farm. He put it at $125 an acre, but he said that is what he thought it worth, he thought it ought to bring that, but he did not say that was its value in the real estate market at a fair open sale, and he did not fix his estimate from the basis of a market value. You, gentlemen of the jury, will recall what this witness said, as well what testimony all the witnesses gave on the question of values, and all other questions in the case, and determine the weight to be given to the testimony of each witness called. That is entirely for you. We have only endeavored to state to you the claims as to it on the one side and the other. Keep in mind that the true test of values always is the market value, and not what any particular witness might think it was worth to him or what he would ask for it, if that opinion is not based

upon the market value where there is shown to be a market value.] [10]

Verdict of guilty, upon which the court sentenced the defendant to pay the costs of prosecution, a fine of $777.08, double the amount embezzled, and to undergo imprisonment for a period of one year and six months.

*Errors assigned* were (1, 2) in sustaining demurrer to plea. (3, 4, 5) In refusing to continue the case. (6–11) Portions of the charge. (12–15) Rulings on evidence, quoting the bill of exceptions.

*John C. Bane* and *W. W. Arnett*, for appellant.—The judgment of the court of concurrent jurisdiction, directly upon the point, is as a plea, a bar, or as evidence, conclusive, between the same parties, upon the same matter directly in question in another court: Hibshman v. Dulleban, 4 Watts, 183; Coffey v. United States, 116 U. S. 436; United States v. Zucker, 161 U. S. 478; Com. v. Evans, 101 Mass. 25; Com. v. Roby, 12 Pickering, 496; Com. v. Cutler, 9 Allen, 486; Com. v. McPike, 3 Cushing, 181; Com. v. Austin, 97 Mass. 595.

The case should have been continued: Simmons v. United States, 142 U. S. 148; United States v. Morris, 1 Curtis C. C. 23; State v. Wiseman, 68 North Carolina, 203; Schrimpton v. Bertolet, 155 Pa. 639; Smith v. Times Pub. Co., 178 Pa. 481; Peterson v. Atlantic City R. R. Co., 177 Pa. 335.

*Albert S. Sprowls* and *William S. Parker*, with them *Alexander M. Templeton*, district attorney, for appellee.—The persons injured by the criminal act of the defendant are distinct, and a conviction or acquittal as to one would be no bar as to the other: Com. v. Sullivan, 104 Mass. 553; Com. v. Rockafellow, 3 Pa. Superior Ct. 588; Com. v. Hazlett, 14 Pa. Superior Ct. 352.

Whether or not it is proper to discharge a jury in a criminal case after it has been sworn and before a verdict is reached, is a question necessarily dependent to a large extent upon the circumstances of the particular case, and naturally rests in the sound discretion of the trial judge: In re Pottstown Borough, 117 Pa. 538; Com. v. Gibbons, 3 Pa. Superior Ct. 413; Com.

v. Purchase, 2 Pick. (Mass.) 521 ; Hubbard v. Gale, 105 Mass. 511 ; Com. v. Cook, 6 S. & R. 577 ; Hilands v. Com., 111 Pa. 1 ; Logan v. United States, 144 U. S. 264 ; United States v. Perez, 9 Wheaton, 579 ; Simmons v. United States, 142 U. S. 148 ; Com. v. Dietrich, 7 Pa. Superior Ct. 519 ; McNeile v. Cridland, 6 Pa. Superior Ct. 428.

OPINION BY W. D. PORTER, J., March 19, 1901 :

The purpose of the Act of May 9, 1889, P. L. 145, was to protect all depositors, or intended depositors, from imposition by bankers who, knowing the bank to be insolvent, continued to receive deposits. The act made unlawful is to "take and receive money from a depositor with the knowledge that . . . . the bank is at the time insolvent," and a part of the punishment prescribed is "a fine in double the amount so received." This legislation was not merely aimed at the carrying on of business by an insolvent bank, but it dealt with specific acts and measured the punishment, in part, by the amount of money obtained by the offender as the result of each specific violation. A banker, who, under the forbidden conditions, receives deposits from two or more different persons, upon the same day, is guilty of two or more separate and distinct offenses. An indictment charging such unlawful receipt of money from A would not be supported by proof of such a receipt of money from B. Neither a conviction nor an acquittal, upon such an indictment, charging a deposit to have been made by one person, is a bar to a subsequent prosecution charging a distinct deposit made by another person : Commonwealth v. Rockafellow, 3 Pa. Superior Ct. 588. The special plea in bar interposed by the appellant at the trial, had subsequently to the former appeal in this case, relied upon the same record which we held, in Commonwealth v. Hazlett, 14 Pa. Superior Ct. 353, not to constitute a bar to the present prosecution. As to the inefficacy of that record to protect the defendant nothing can be profitably added to the opinion of President Judge RICE, who spoke for the court upon the former appeal.

It is contended that a different question is now presented, for the reason that the plea last filed, while still based upon the same record, contains further averments. It has been argued, with great ability, that, the commonwealth having demurred to

the plea, the averments in addition to the record are to be taken as true.   On demurrer to a plea in bar the court will consider the whole record, and give judgment for the party who, on the whole, appears to be entitled thereto: Murphy v. Richards, 5 W. & S. 279; Heikes v. The Commonwealth, 26 Pa. 513. Whether the former acquittal was for the same offense depends upon the record pleaded, and not on the argument or inference deduced therefrom.   The plea averred the offense to have been the same, but the effect of this was to change the record, and the record must stand: Commonwealth v. Trimmer, 84 Pa. 65. Upon the trial of the issue formed by the record pleaded in bar the burden was upon the commonwealth to prove that the defendant had, as a banker, and knowing himself to be insolvent, received a deposit from one J. Clark Allen.   A failure to prove a deposit by Allen must have resulted in a determination of the issue adversely to the commonwealth.   The evidence necessary to a conviction in the present prosecution would not have been sufficient to convict of the offense charged in the record pleaded in bar.   The defendant in the plea now presented seeks to avoid this rule by averring that upon the trial of the former indictment he admitted that he had, as a fact, been a banker, and, as such, received from Allen the deposits charged in the indictment, and that, therefore, the only question of fact passed upon by the jury in that case was the insolvency of the defendant and his knowledge thereof.   Here, again, the averments came into collision with the record, which was the cornerstone of the plea in bar.   The record showed a plea of not guilty and the general issue, under which the jury must, in some manner, be satisfied beyond a reasonable doubt that Allen had made a deposit in the bank.   If the defendant went upon the witness stand and made admissions, those admissions were evidence to be considered by the jury, but they were not conclusive.   Allen may have gone upon the stand and testified that he had never made such a deposit.   The jury might have been convinced that the defendant was not mentally responsible at the time he testified.   It may have been clearly established that, although the deposit was made, it was not received with fraudulent intent and was returned to the depositor, or that the defendant had fully informed Allen as to the condition of the bank.   The fact still remained one for the jury to pass upon

under the issue. It cannot be said that the verdict of the jury did not turn upon that very question. The first and second specifications of error are dismissed.

The motion of the defendant to dismiss the jury and continue the cause on account of occurrences which resulted from the alleged talking about the case by one Gray, in the presence of a juror, raised a question in disposing of which the court below was vested with discretionary powers. An appellate court will not reverse upon such a question, unless an abuse of discretion be distinctly charged and clearly established. There does not appear to have been any abuse of discretion by the learned judge of the court below. The same principle applies to a refusal to continue a cause upon the ground of the absence of a witness. The third, fourth and fifth assignments of error are not sustained.

The sixth and seventh specifications of error are based upon a slip of the court in stating the evidence. The attention of the court having been called to this matter, the mistake was corrected and the defendant was not thereby injured. If the facts stated in the language of the court which is the subject of the eighth assignment of error were found by the jury, they constitute sufficient evidence to justify a finding that the defendant was insolvent, and this specification is without merit.

The ninth specification assigns for error a single sentence, covering two pages of printed matter, contained in the charge of the learned court below. A page and a half of this sentence recites the theory of the commonwealth, and the contention of the counsel for the prosecution as to the force and effect of the evidence of the commonwealth and the weakness and incredibility of the testimony offered by the defendant, and seems to fairly state what had been the contention of such counsel. The difficulty comes in the concluding part of the sentence, where the court instructed the jury as to the effect of the incompetency of the testimony of two witnesses of the defendant upon all the other evidence produced by him. The court had just recited the allegation of the commonwealth as to the testimony of the witnesses White and Little; that those witnesses had based their evidence as to the value of three pieces of real estate not upon the market value, but upon what they proposed to pay for the property in certificates of deposit

of the defendant bank, which were then selling and being offered for sale at from fifty to seventy-five cents upon the dollar of their face value.  In immediate connection with this reference to the testimony of Little and White, the court said : "And if this is found by you to be the case, then, under all the evidence, including the defendant's testimony, the estimates of value are not founded upon the proper basis and the values of these three pieces of property would not be greater, in fact, than the value placed thereon by the commonwealth ; all of this affects the values placed on the whole of the defendant's property by himself and son, and all other of his witnesses testifying to values not based on fair market values ; and that you should have no trouble in coming to the conclusion that the defendant was insolvent on March 12, 1898."   This was, in effect, saying to the jury that if the testimony of White and Little as to the value of that real estate was based upon what they would have paid for it in depreciative certificates, that fact vitiated the testimony of the defendant, and all the other witnesses of the defendant, not only as to the value of the three specific properties, but as to that of the whole of the defendant's property.   Even if the testimony of White and Little as to the values was not based upon market value, the jury were not bound to accept the opinions of the witnesses for the commonwealth.   It was for the jury to determine what the property was worth, in view of its character, condition and location, and the opinions of those who were supposed to have an expert knowledge upon the subject were offered as evidence to be considered by the jury in arriving at their conclusion.   The competency of the witnesses to testify as experts is supposed to have been settled when their testimony was offered.   The ninth specification of error is sustained.

In that part of the charge embraced by the tenth assignment of error we find this language : " The testimony of Mr. M. W. McClane, to which the defendant calls our attention, was as to the value of the Hamilton farm.   He put it at $125 an acre, but he said that is what he thought it worth.   He thought it ought to bring that, but he did not say that was its value in the real estate market at a fair open sale, and he didn't fix his estimate from the basis of a market value."   A careful reading of the testimony of the witness in question leads us to a conclu-

sion different from that at which the learned court below arrived. The witness did say that he was acquainted with the market value of farm land in that community in March, 1898. He was asked what was the fair market value of that particular farm, at that time; he was permitted to answer the question without objection. His answer was: "I should think it worth $125 per acre." Yet the learned judge of ·the court below said to the jury that this witness did not fix his estimate from the basis of a market value. The jury had already been told, in that part of the charge considered under the ninth specification of error, that such evidence not founded upon market value was not upon the proper basis, and, practically, that the jury were to disregard it. Considering these instructions, in the light of each other, the jury must have concluded that the court intended to say to them that the testimony of McClane was not worthy of consideration. "The value of an expert's opinion may be fortified on the one hand or reduced on the other by an examination as to his general experience, his means of knowledge in the particular case, and the facts and reasons on which he bases his conclusion. It is a matter of opinion at best, and the lowest grade of evidence that comes into a court of justice. It is permissible only because, bad as it is, there is nothing better.attainable. Opinions as to the value of real estate are apt to differ, and their value is not always in proportion to the confidence with which they are advanced:" Dawson v. Pittsburg, 159 Pa. 317. The only competent evidence as to the value of the farm in question, which had been introduced upon either side, consisted of the opinions of witnesses, as to the market value of the land, based upon the selling price of land of like character in the vicinity; that is, what the witnesses, respectively, thought the land would bring in the market. This was, in every case, a mere matter of opinion, and the value of the opinion was for the jury. A witness who has no knowledge upon the subject of market value, derived from the prices at which lands are held and sold in the vicinity, is not competent to testify as an expert on such a question. The tenth assignment of error is sustained.

The eleventh assignment of error is without merit. A banker whose business is managed by others may be deceived as to the true condition of his affairs, and be insolvent without knowing

it. His knowledge of his insolvency is an essential element in the offense with which this defendant was charged. It was proper to permit the witness, R. S. Winters, who had been one of the appraisers of the insolvent estate, when confronted with the appraisement which he had made, to make an explanation as to the manner in which they had arrived at the values of the property appraised.

In the ruling which is complained of in the thirteenth specification, we are convinced that the learned judge of the court below fell into error. The witness was called for the purpose of proving the value of certain stock, and candidly admitted that he knew nothing about the value of the stock at the time of the assignment. He said that he had made an investigation subsequently to the assignment. It would clearly have been competent to permit this witness to state to the jury what properties were owned by the corporation, and, if he knew, the value thereof; the liabilities of the company, and, if he had personal knowledge thereof, the condition of its affairs. The witness did not pretend to any expert knowledge which made him more competent than any member of the jury to form an intelligent opinion upon the facts. The witness was permitted to testify, under objection, that he had had an interview with Elliott Rogers, Esq., who was the secretary of the mining company, and from that interview he had arrived at the conclusion that the stock was worthless. There was no evidence that Mr. Rogers had any knowledge of the properties owned by the company, or of the value thereof. The secretary of a corporation does not, necessarily, know the value of its properties. This stock was not one dealt in on the open market. Mr. Rogers would not have been permitted to testify, as to the value of the stock, without first showing that he had personal knowledge of the condition of the affairs of the corporation. The evidence shows that Mr. Rogers was within the reach of the subpœna of the court. If his knowledge was to be made available for the prosecution in this case, the defendant was entitled to cross-examine him as to the extent of his knowledge, before he could have been permitted to give an opinion as to the value of the stock. Yet the learned court below permitted the witness called to give an opinion founded upon the opinion of another person not called, without any attempt whatever to show that either the witness or

his informant had any knowledge which rendered either of them competent to testify as to their opinion of the value of the property in question.

The evidence which is the subject of the fourteenth specification was properly admitted. The witness was permitted to testify to the facts which he himself had communicated to the defendant prior to the alleged commission of the offense charged.

The fifteenth specification is equally without merit. When a witness has been permitted to testify as an expert as to the values of real estate, a reasonable latitude is allowed for cross-examination, in order that the jury may be fully informed as to the facts upon which the opinion of the expert is based and the processes of reasoning by which he arrives at the conclusion given.

The judgment is reversed and a venire facias de novo awarded.